## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 17 2020, 9:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
| --- | --- |
| Jon R. Rogers | Mark S. Lenyo |
| Mishawaka, Indiana | South Bend, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas Avery,
*Appellant-Respondent,*

v.

Laura Mae Avery,
*Appellee-Petitioner.*

January 17, 2020

Court of Appeals Case No.
19A-DR-1118

Appeal from the St. Joseph Circuit Court

The Honorable John Broden, Judge

The Honorable William L. Wilson, Magistrate

Trial Court Cause No.
71C01-1503-DR-241

**Altice, Judge.**

## Case Summary

This case is before us once again. In *Avery v. Avery*, No. 71A04-1712-DR-2960 (Ind. Ct. App. July 23, 2018), a divided panel of this court determined in an unpublished memorandum decision that the trial court had abused its discretion in ordering Thomas Avery to pay temporary maintenance to his estranged wife, Laura Avery, during the pendency of their dissolution of marriage proceedings. Now, Thomas is appealing the trial court's final distribution of the marital assets.

We affirm.

## Facts & Procedural History

The parties were married on July 7, 1967, and had six children together during the course of their marriage. Laura and Thomas separated in August 1998 and from that time until Laura petitioned for dissolution of marriage in March 2015, the two had very little contact with each other. No provisional orders were requested or in effect until 2017 when Laura sought monthly maintenance payments from Thomas.

After separation, Laura maintained custody of their surviving children,[1] and Thomas did not pay child support. Thomas was estranged from most of the children, but Laura and Thomas would talk periodically when Laura took one of their daughters to Thomas's residence for visits.

---

[1] One of the children died prior to the parties' separation.

[5]     The marital residence was on Hoover Avenue in Mishawaka. Thomas continued living there after the separation, while Laura and the children found other housing. Laura did not work outside the home until the parties separated. Her name was not on any of the parties' bank accounts, and Thomas controlled the family funds.

[6]     Thomas had approached Laura about dissolving the marriage sometime in 1998. Thomas contacted attorney Richard Currey and scheduled a meeting for July 9, 1998, at which Thomas presented a document entitled, "marital settlement agreement" (Agreement), to Currey for his review. *Transcript* at 8-9, 42-43; *Appellant's Appendix Vol. II* at 37-38. The Agreement discussed various issues including child custody and visitation. However, no retirement plans, bank accounts, or investments were listed.

[7]     On July 15, 1998, Currey told the parties that he could no longer assist them until it was decided who would initiate the dissolution action. Thomas called Currey the next day and indicated that he would file the petition for dissolution. Although the parties physically separated on August 9, Thomas contacted Currey the next day and directed him to "put everything on hold, indefinitely." *Transcript* at 11. The Agreement was neither finalized nor submitted to the trial court.

[8]     Since the separation, the parties were financially independent and shared no expenses. Laura began working shortly after the separation as a fulltime health care aide, earning approximately $10 per hour. Laura, also had a trust fund that her

mother created for her in the amount of $10,000. Laura depleted those funds at some point shortly after she and Thomas separated.

[9] At the time of separation, Thomas had a vested pension with his employer, Allied Signal, a subsidiary of Honeywell, that would have permitted him to draw $281.13 per month as of a normal retirement date of August 1, 2013. Thomas left employment with Allied Signal in 1995 and worked for Honeywell from August 1999 until he retired on June 1, 2010. During Thomas's employment with Honeywell, his pension with that company began to increase in value and a survivorship benefit option was added. Thomas elected to maintain this benefit for Laura and the children.

[10] In 2010, Thomas requested that Laura "sign off" from the survivorship benefit provision so his monthly pension payment would not be reduced. *Transcript* at 57. Laura refused to do so, and when Thomas retired, his monthly pension payment from Honeywell totaled $1202.62 that was reduced by Laura's $132.29 survivorship benefit. Thus, Thomas received a monthly pension of $1070.33.

[11] Sometime in 2000, eminent domain proceedings commenced on the Hoover Avenue property. Thomas ultimately received a settlement of between $75,000 to $100,000. He did not distribute any of those proceeds to Laura. Rather, Thomas invested those funds in a residence located on Buckeye Road in Mishawaka and purchased his brother's interest in that property.

[12] Shortly after Thomas retired, he moved to Oregon with Cynthia Willard for approximately three years. Thomas subsequently returned to Indiana and has lived

on the Buckeye Road property since 2014. At the final hearing, Thomas claimed that he transferred ownership of the Buckeye Road property to Willard at no cost to her in 2010. However, no deed had been recorded documenting that transaction. Thomas claimed that he and Willard went to a bank with a warranty or quit-claim deed, notarized it, and transferred the property to her. Thomas further testified that he had been paying Willard $600 per month for maintenance and upkeep on the Buckeye Road property.

[13] Laura petitioned to dissolve the marriage in 2015. She continued to work approximately forty hours per week as a health care aide, earning $10 per hour. However, she suffered a stroke during the latter part of 2016 and did not work for several months. During the recovery period, Laura depleted all of her $10,000 IRA savings to pay for living expenses, and she ultimately filed for Chapter 7 bankruptcy in December 2017. At the time of the final hearing in December 2018, Laura was working about twenty hours per week and was receiving $650 per week in Social Security benefits.

[14] At the conclusion of the final hearing, the trial court ordered the marriage dissolved and concluded that Thomas should continue to receive his monthly pension distribution and Laura should continue to maintain the survivorship benefit option. The trial court also included the Buckeye Road property in the marital estate. Following the hearing, the trial court issued the following findings of fact and conclusions of law:

7. At this time, Thomas receives $1,1070.33 each month from this pension. This amount is reduced from $1,202.62 per month because Thomas elected a survivorship benefit for Laura.

8. Thomas's pension originated with his employer until 1995 when the employer changed. The new employer treated the pension as if Thomas had been an employee of the new employer for the years in which the pension accrued. In other words, the change in employers did not affect the growth of the pension benefit.

9. In 1998, the monthly pension benefit that was available to Thomas was $281.13. Since then, it has grown by a little less than $1,000.

. . .

11. If Thomas should die first, Laura will receive $535.17 for the remainder of her life. If Laura dies first, Thomas's pension benefit will remain at $1,1070.33.

. . .

22. In this case, there is no question that Thomas's pension is part of the marital pot.

. . .

25. There is no question that Thomas was the party who alone contributed to the growth of the pension benefit between the time the parties physically separated and the time that they legally separated in March of 2015.

. . .

27. Laura has no savings or retirement funds because she suffered a stroke and had to live off of her 401(k) funds while she recovered. Although Laura has recovered at this point, the Court finds her testimony that she is unable to work full time to be credible. Laura's earnings in 2017 were less than $8,000, which appears to track with her 2018 earnings. Thomas's pension benefit, however, provides him with over $12,000 each year.

28. The Court must also note that Thomas owns his residence free and clear of any mortgages while Laura must pay rent for an apartment. Thomas testified that he had conveyed title to his residence to a friend in Oregon as a form of a security interest, but the deed was not produced in evidence. The Court finds that Thomas's claim is not supported by credible evidence.

29. From the evidence, it is fair to say that both Thomas and Laura have presented persuasive arguments that the Court should conclude the presumption favoring an equal division has been rebutted. This conclusion does not answer the central question, however. Exactly how the presumption has been rebutted must be determined.

30. During the time that [Thomas's] pension grew in value, the parties lived all but completely separate lives. This is not a situation where Laura maintained the home and thus allowed Thomas to continue working and building the pension. In his mind, Thomas's marriage to Laura was over but for the legal paperwork.

31. On the other hand, Thomas never filed for dissolution of marriage, and the pension grew while he remained married. If Thomas wanted to preserve the bulk of his pension benefits for himself, he could have— and probably should have—filed for dissolution in 1999 when the "new" pension went into effect. The law

favors individuals who do not sit on their rights and act to protect them, as shown by the equitable doctrine of laches.

32. Still, Laura did nothing between 1999 and 2015 to help grow the pension. There is an element of unfairness associated with continuing to remain married in order to perhaps obtain a share of a more valuable pension. The Court is not concluding that this was Laura's motive, but the Court must be mindful that this case could establish precedent for future cases with similar facts. It can also be said that there is an element of unfairness in a ruling that would favor an individual who sat by and took no action to protect his rights and preserve the bulk of his pension. Regardless of the outcome, it is hard to miss the equities on both sides.

. . .

34. Laura's economic circumstances (limited work earnings, Social Security income approximately one-half of Thomas's Social Security receipts, monthly housing expense) are worse than Thomas's economic circumstances. Thomas did not act to preserve his pension, even when Laura declined to waive her survivor benefit when Thomas asked her to do so in 2010. While the dollar-value effect of Laura's refusal was not that significant, Laura's refusal was a clear indication that she felt she had some rights to Thomas's pension benefits. It would have been more reasonable for Thomas to have acted at that point in time by filing a dissolution petition.

35. The Court cannot ignore the fact that Thomas is retaining his real estate on Buckeye Road in St. Joseph County. Thomas acquired this property in part by investing the proceeds he received when AM General purchased the parties' marital residence on Hoover Avenue in Mishawaka, Indiana. Thomas also bought out his brother's interest in the Buckeye Road property. The testimony suggests that the value of this property (based on the value of funds from the AM General purchase and the buy out price) exceeds $100,000. Again, this

> property has no mortgage obligations, and the Court concludes that the purported transfer of the property to a friend was not legally effective in the absence of a deed and the recording of the transfer.

*Appellant's Appendix Vol. II* at *14-21.* In the end, the trial court included Thomas's interest in the Buckeye Road property as part of the marital estate and determined that an equal division of Thomas's pension as of March 2015 would achieve a just and reasonable result.

[15] Laura and Thomas both filed motions to correct error. Laura alleged that the trial court should have awarded her a greater portion of Thomas's pension benefit because she believed that the final order erroneously stated that she had already "been receiving the survivor benefit" payments. *Appellant's Appendix Vol. II* at 23. Thomas asserted in his motion that the trial court erred in including the Buckeye Road property in the marital estate. Thomas included an affidavit from Willard and a copy of the purported deed to the Buckeye Road property with his motion. These documents were designated "newly discovered evidence," allegedly establishing that Thomas had quit-claimed the property to Willard on April 27, 2010, and that Willard was in possession of the unrecorded deed. *Appellant's Appendix Vol. II* at 27, 29, 30-31. The trial court did not rule on either of the parties' motions to correct error. Thus, they were deemed denied, and Thomas now appeals.[2]

---

[2] Although Thomas asserted in his motion to correct error that the trial court should allow the affidavit and deed to be admitted into evidence on the basis of newly discovered evidence, he does not pursue that claim on appeal.

# Discussion and Decision

## *I. Standard of Review*

[16] The division of marital assets lies within the trial court's sound discretion, and we will reverse only for an abuse of discretion. *Wells v. Collins*, 679 N.E.2d 915, 916 (Ind. Ct. App. 1997). An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A party challenging the trial court's property division must overcome a strong presumption that the court considered and complied with the appropriate statutory guidelines. *Id.* This presumption is one of the strongest presumptions applicable to our consideration on appeal. *Harris v. Harris*, 42 N.E.3d 1010, 1017 (Ind. Ct . App. 2015). We consider only the evidence most favorable to the trial court's disposition of the marital property and we may not reweigh the evidence or assess the credibility of the witnesses. *In re Marriage of Perez*, 7 N.E.3d 1009, 1010-11 (Ind Ct. App. 2014).

[17] We further note that all marital property, whether owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts, goes into the marital pot for division. Ind. Code § 31-15-7-4(a); *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App.

---

Nonetheless, Thomas has failed to establish, among other things, that such evidence was discovered since the final hearing, and that due diligence was used to discover it in time for trial in accordance with Indiana Rule of Trial Procedure 59(A)(1). In fact, Thomas acknowledged at the final hearing that while he possessed a copy of the deed, he did not bring it with him to the hearing.

2014). The requirement that all marital assets be placed in the marital pot is meant to insure that the trial court first determines the value before endeavoring to divide property. *Montgomery v. Faust*, 910 N.E.2d 234, 238 (Ind. Ct. App. 2009). This "one pot" theory insures that all assets are subject to the trial court's power to divide and award. *Hill v. Hill*, 863 N.E.2d 456, 460 (Ind. Ct. App. 2007). The trial court's disposition of the marital estate is to be considered as a whole, not item by item. *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind. 2002).

## II. Division of the Marital Estate

### A. Buckeye Road Property

Thomas argues that the trial court erred when it considered his "non-existent ownership interest" in the Buckeye Road property to be a part of the marital estate. *Appellant's Brief* at 9. He claims that the property should not have been included in the marital pot because he had transferred the property to Willard.

At the final hearing, Thomas testified that he had transferred the Buckeye Road property—valued in excess of $100,000—to Willard, "a ranch owner in Oregon," with no consideration. *Transcript* at 64. When pressed to produce a copy of the deed, Thomas testified that he had a copy of it but he did not "bring it with [him to court]." *Id.* at 63-64.

Thomas claimed that he did not know why the recorder's office did not show a transfer of the property's ownership. Thomas acknowledged that he had been living at the Buckeye Road property for nearly four years following his return from Oregon and had not been paying rent.

Considering Thomas's self-serving testimony and the absence of other substantiating and credible evidence establishing that a transfer of the Buckeye Road property to Willard at no cost to her occurred, it is apparent that this lack of evidence affected the trial court's assessment of Thomas's testimony. The trial court, as the fact finder, properly exercised its discretion in discounting Thomas's testimony, and his claims amount to an invitation to reweigh the evidence—an invitation we decline. *See In re Marriage of Perez*, 7 N.E.3d at 1010-11; *see also Myers v. Myers*, 13 N.E.3d 478, 485 (Ind. Ct. App. 2014) (noting that there is a preference for granting latitude and deference to our trial judges in family law matters). Thus, we conclude that the trial court properly considered the Buckeye Road property as part of the marital estate.

### B. Thomas's Pension

Thomas contends that the trial court improperly divided his pension because it failed to adequately account for the length of the parties' separation. Thomas claims that the valuation date for a just and reasonable division of his pension should have been as of the parties' separation in 1998, rather than in 2015 when Laura petitioned to dissolve the marriage. In short, Thomas argues that he should have been awarded a greater percentage of his pension benefit.

The trial court has broad discretion in determining what constitutes a just and reasonable division of the marital assets. *Wortkoetter v. Wortkoetter*, 971 N.E.2d 685, 689 (Ind Ct. App. 2012). An equal division of marital property is presumptively just and reasonable, but this presumption may be rebutted if a party presents relevant evidence as to the following factors:

"(1) each spouse's contribution to the acquisition of property; (2) acquisition of property through gift or inheritance prior to the marriage; (3) the economic circumstances of each spouse at the time of disposition; (4) each spouse's dissipation or disposition of property during the marriage; and (5) each spouse's earning ability." I.C. § 31-15-7-5. If a trial court orders an unequal division, it must consider all of the factors in the statute. *Love v. Love*, 10 N.E.3d 1005, 1012 (Ind. Ct. App. 2014). While a trial court need not explicitly address each statutory factor when it unevenly divides property, a reviewing court must be able to infer that all the statutory factors were considered. *Id.*

Here, it is apparent that the trial court identified and addressed each of the statutory factors enumerated in I.C. § 31-15-7-5. The trial court's findings discuss the evidence that it relied upon in making its decision, and it noted that Thomas, alone, contributed to the pension's growth from the time of the parties' separation until March 2015 when Laura petitioned for dissolution.

The trial court also addressed Thomas and Laura's economic circumstances. It acknowledged that Laura had no savings accounts or retirement funds because of her physical ailments, and she was unable to work on a fulltime basis. The major stroke that Laura suffered required surgery and limited the hours that she could work. Her absence from the workforce for several years affected her earnings even long after she had separated from Thomas. Laura had exhausted her 401K funds during her recovery from illness, and her earnings in 2017 were less than $8000, thus placing her below the poverty line.

[27] The trial court found that Thomas's pension benefit provides him with over $12,000 per year, and he received nearly $21,000 in social security benefits in 2017. His allegations regarding the Buckeye Road property were found not credible. While Thomas's earnings at Honeywell were stable, Laura—with no significant work history—supported the children and herself at a ten-dollar-per-hour job. After considering all of the circumstances in this case and weighing the evidence, the trial court exercised its discretion and ultimately determined that an equal division of Thomas's pension benefit as of March 2015 would be more "just and reasonable" in accordance with I.C. § 31-15-7-5.

[28] We note that Thomas directs us to *Marriage of Perez* for the proposition that a more equitable distribution of the property could have been achieved in this instance. In *Perez,* the parties married in 2002 and physically separated in March 2006. The parties did not commingle assets and lived separate lives for a number of years. In January 2011, the husband purchased a lottery ticket and won $2 million. He petitioned for dissolution of the marriage two months later. The trial court ultimately awarded wife $50,000 of the lottery proceeds and she appealed. A panel of this court affirmed, observing that the trial court found that the extended physical separation, during which time no funds were ever commingled and each person lived as an individual, "justified limiting [wife's] equitable interest in the lottery winnings." 7 N.E.3d at 1011.

[29] *Perez* does not control the outcome here, as that case did not involve a 51-year-long marriage and a noncustodial parent who failed to financially support his dependents, despite being able to do so. Rather, *Peerez* involved the wife's claim for a portion of

the winnings that were the result of the husband's good luck at playing the lottery. The circumstances of the husband's windfall lottery earnings in *Perez,* alone, render that case distinguishable and inapposite from this case.

[30] In sum, it is apparent here that the trial court considered the various points of view, weighed the evidence presented, and adequately considered the statutory factors set forth in I.C. § 31-15-7-5, in determining what constituted a just and reasonable division of the marital assets. Although Thomas posits that a different division would have achieved a more fair and equitable distribution of the property, the trial court's broad discretion "includes the ability to consider a range of just and reasonable divisions." *See id.* at 1012. As a result, we cannot say that the trial court abused its discretion in the manner in which it chose to divide the marital property.

[31] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.